IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

VIRGINIA IS FOR MOVERS, LLC, *et al.*,
*individually and on behalf of all those*
*similarly situated*,
      Plaintiffs,

     v.

APPLE FEDERAL CREDIT UNION,
      Defendant.

Civil No. 1:23cv576 (DJN)

## **MEMORANDUM OPINION**

This putative class action, brought by Plaintiffs Virginia is for Movers, LLC, and Abigail McAllister, challenges Defendant Apple Federal Credit Union's overdraft fee policy.[1]  Plaintiffs allege that Apple's overdraft policy violates the law in two ways:  first, by breaching Apple's own membership agreement; and second, by violating a regulation promulgated by the Consumer Financial Protection Bureau.  Apple now moves to dismiss both counts.  (ECF No. 18 (the "Motion to Dismiss").)  Apple argues that Plaintiffs' contract claim fails, because Apple's membership agreement unambiguously authorizes the policy at issue; it further argues that Plaintiffs' disclosure claim must be dismissed for lack of a private right of action and for failure to state a claim under the applicable regulation.  None of Apple's arguments convince the Court, and the Court will accordingly DENY Apple's Motion to Dismiss.

---

[1]     For ease of reference, this Memorandum Opinion refers to Plaintiffs individually as "Movers" and "McAllister," both Plaintiffs together as "Plaintiffs," and to Defendant as "Apple."

## I.      BACKGROUND

Credit and debit card transactions typically happen in two distinct phases.  The first phase, authorization, occurs when a customer swipes their card at a merchant's place of business. At that time, no money changes hands, but the transaction nevertheless takes place because, by authorizing the transaction, the bank or credit union guarantees that either it or the customer will eventually pay.  The second phase, settlement, occurs only when the customer's funds make their way from the issuer's institution to the merchant's.  *See, e.g.*, *Mastercard Switching Explained*, Switching Services [https://perma.cc/H2GS-WAA9] (last visited Feb. 29, 2024) ("Authorization" verifies "availability of funds at the time of purchase," while "[s]ettlement" "facilitates the exchange of funds").

A bank may calculate a customer's balance for overdraft purposes with reference to either of these two phases.  *Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 6 (D.D.C. 2016). A bank may use the "actual balance" method, which calculates an account's balance using only transactions that have settled (*i.e.*, those where funds have already changed hands).  *Id.* Alternatively, the "available balance" method "calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions."  *Id.* (quoting 7 CFPB Supervisory Highlights 8 (Winter 2015) [https://perma.cc/NEZ4-WCRY]).

Apple assesses overdrafts using the "available balance" method.  Plaintiffs' Second Amended Class Action Complaint (the "SAC") alleges that Apple charges overdraft fees on what Plaintiffs call "Authorize Positive, Settle Negative" ("APSN") transactions.  (ECF No. 17 (SAC) ¶ 21.)  Plaintiffs plead that, when Apple authorizes a customer's transaction on an account with sufficient funds to cover it (*i.e.*, when the available balance in the account exceeds the price to be paid), Apple reduces the customer's balance by the transaction's cost, sequesters funds sufficient

to cover the transaction, and adjusts the "available balance" displayed to the customer to reflect that sequestration.  As a result, the customer always has enough money to execute such "authorize positive" transactions.  (*Id.* at ¶¶ 22, 25.)  Because Apple reduces the available balance in this way, Apple compares subsequent intervening transactions to the customer's available balance and assesses overdraft fees if those subsequent transactions would leave the customer's available balance negative.  (*Id.* at ¶ 27.)  However, despite having reserved sufficient funds, Apple charges additional overdraft fees on already-authorized transactions when those transactions settle into a negative available balance created by intervening transactions.  (*Id.* at ¶ 28.)  The time delay between authorization and settlement allows those transactions to be "authorized positive," but "settle negative."

By way of illustration, consider the following hypothetical example.  On Monday, Customer A has a checking account balance of $100 and buys a $75 widget.  Customer A holds her checking account with Bank X, which authorizes the transaction and sets aside $75 to account for the purchase at the point of sale.  Because Bank X uses the "available balance" method, Customer A's balance decreases to $25 as soon as Bank X authorizes her widget purchase.[2]  Customer A's widget purchase, however, takes days to settle.  On Wednesday, before the widget purchase settles, Customer A buys a $30 gadget.  Again, Bank X authorizes the transaction and decrements Customer A's available balance by $30.  Customer A's available balance falls below zero, and Bank X assesses an overdraft fee.  On Thursday, Customer A's widget purchase finally settles.  But because Customer A's intervening gadget purchase lowered her available balance to -$5, Bank X assesses a second overdraft charge when the widget

---

[2]      If Bank X used the "actual balance" method instead, Customer A's balance would stay at $100 until her transaction settles.  Only at that point, when Bank X wires $75 to the widget merchant, would Customer A's balance decrease.

purchase settles into an overdrawn account — even though Bank X already set aside all $75 needed to pay the widget merchant.  The second overdraft fee results from an APSN transaction. These APSN fees, which Plaintiffs allege they did not agree to and cannot foresee, form the basis of Plaintiffs' claims.

Plaintiffs allege that APSN transactions violate Apple's Membership and Account Agreement (the "Contract").  (ECF No. 17-1 (SAC Ex. A) at 4.)  Specifically, Plaintiffs allege that, in APSN transactions, the "available balance in [a customer's] share or deposit account" suffices "to pay the full amount of a [transaction] . . . that is posted."  (SAC ¶ 39.)  In other words, in Plaintiffs' view, "[Apple] assesses [o]verdraft [f]ees when there is enough money in the account's available balance to cover the transaction."  (*Id.* at ¶ 42.)  Apple does this, Plaintiffs say, even though "[Apple]'s Opt-In Form expressly states that [Apple] determines the account's available balance for overdraft purposes when the merchant 'receive[s] authorization for transaction payment.'"  (*Id.* at ¶ 46 (quoting Overdraft Privilege Opt-In Form (the "Opt-In Form"), SAC Ex. B).)  Instead, Apple allegedly "authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions." (*Id.* at ¶ 49.)  Because Apple's customers never agreed to such a procedure, Plaintiffs allege that Apple's contract "misleads and deceives account holders."  (*Id.* at ¶ 63.)

Plaintiffs predicate a breach-of-contract claim on their allegation that the Contract does not authorize Apple's policy of charging overdraft fees on APSN transactions.  (SAC ¶ 106.) Further, Plaintiffs allege that Apple violated the implied covenant of good faith and fair dealing by "abus[ing] its discretion in its own favor" in enacting its APSN policy.  (*Id.* at ¶ 109.) Plaintiffs' breach-of-contract theory and their implied-covenant theory together constitute Count One of the SAC, brought on behalf of both Movers and McAllister.

4

Count Two of the SAC, brought on behalf of McAllister (but not Movers), alleges that Apple's APSN policy violates a legislative rule promulgated by the Consumer Financial Protection Bureau (the "CFPB").  Congress gave the CFPB broad rulemaking power to enforce a variety of laws when it passed that agency's organic statute in 2010.  *See* Consumer Financial Protection Act of 2010, Pub. L. No. 111-203, § 1002(12), 124 Stat. 1955, 1957 (codified at 12 U.S.C. § 5481) (listing 17 statutes as within the CFPB's aegis).  Regulation E, 12 C.F.R. pt. 1005, the rule at issue here, implements the Electronic Fund Transfer Act (the "EFTA")[3] pursuant to the CFPB's power to "prescribe rules to carry out the purposes" of that statute.  *Id.* at § 1084(3), 124 Stat. at 2082 (amending Section 904 of the EFTA).  Specifically, McAllister alleges that Apple's overdraft policy violates Regulation E's Opt-In Rule, 12 C.F.R. § 1005.17(b), which states that "a financial institution . . . shall not assess a fee or charge . . . pursuant to the institution's overdraft service" unless the institution provides written notice to the consumer and gives the consumer "a reasonable opportunity" to "affirmatively consent." Because McAllister pleads that the actual notice that she received was inaccurate and misleading, she alleges that she — alongside the nationwide class that she seeks to represent — stands entitled to compensatory and statutory damages.  (SAC ¶ 123.)

## II.        STANDARD

Apple's Motion to Dismiss rests on Fed. R. Civ. P. 12(b)(6).  When resolving a Rule 12(b)(6) motion, which tests the "sufficiency of the complaint," the Court must take Plaintiffs' allegations as true and draw all reasonable factual inferences in their favor.  *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021) (internal citations omitted).  However, the Court "need not

---

[3]        Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. No. 95-630, tit. XX, § 2001, 92 Stat. 3641, 3728–41.  The EFTA has since been codified at 15 U.S.C. § 1693 *et seq.*

accept legal conclusions couched as facts." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (internal quotation omitted). After the Court applies the rules of construction above, what remains of the SAC must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In that case, the SAC makes out a case for liability that is "plausible on its face," and the Motion to Dismiss must be denied. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Because Plaintiffs attached the Contract, the Opt-In Form, and a third document titled "Overdraft Protection Options" ("OPO") as exhibits to the SAC, those three documents constitute "part of the [SAC] for all purposes." Fed. R. Civ. P. 10(c). In the event of a conflict between these exhibits and the SAC, the Contract, Opt-In Form, and OPO's text must prevail. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). This "exhibit-prevails rule" finds its roots in the Federal Rules' "presumption that the plaintiff, by basing his claim on the attached document, has adopted as true the contents of that document." *Id.* at 167. Here, the Contract, Opt-In Form, and OPO are the foundation of Plaintiffs' claims, and Plaintiffs do not argue to the contrary. This Memorandum Opinion therefore takes those exhibits to accurately represent Apple's policies and gives them precedence over the SAC, as the exhibit-prevails rule requires.

### III.        ANALYSIS

#### A.        Breach of Contract (Count One)

Apple contends that the Contract unambiguously permits its APSN policy. Plaintiffs contend that the Contract presents ambiguity that only discovery can resolve. Looking exclusively to the four corners of the Contract, as applicable Virginia law requires, the Court agrees with Plaintiffs, finds the Contract's language ambiguous, and concludes that Apple's motion to dismiss Plaintiffs' contract claim must be denied.

### 1.      Virginia's Law of Contracts

The Contract is governed by, and must be construed in accordance with, "the laws and regulations of the [Commonwealth] of Virginia." (Contract § 33.) Because Virginia's law of contracts controls the disposition of Count One, a summary of that body of law follows.

Contract interpretation is a pure question of law for a court to decide. *Bolton v. McKinney*, 855 S.E.2d 853, 855 (Va. 2021). To interpret a contract, a court "must construe [it] as it is written." *Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc.*, 662 S.E.2d 77, 80 (Va. 2008). The "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning"; "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it[;] and there is a presumption that the parties have not used words needlessly." *PMA Cap. Ins. Co. v. U.S. Airways, Inc.*, 626 S.E.2d 369, 372–73 (Va. 2006). In addition, contracts must be construed "as a whole," with all provisions "harmonized, giving effect to each when reasonably possible." *Schuiling v. Harris*, 747 S.E.2d 833, 836 (Va. 2013).

In Virginia, a court "cannot look beyond [the] language" of an unambiguous contract. *Norfolk S. Ry. Co. v. Zayo Grp., LLC*, 87 F.4th 585, 589 (4th Cir. 2023) (citing *Amos v. Coffey*, 320 S.E.2d 335, 337 (Va. 1984)). "Where an agreement is complete on its face, and is plain and unambiguous in its terms," courts lack liberty "to search for its meaning beyond the instrument itself." *Sch. Bd. of Newport News v. Commonwealth*, 689 S.E.2d 731, 735 (Va. 2010) (cleaned up). However, "when a contract is ambiguous[,] it is necessary [for a court] to resort to parol evidence to ascertain the intention of the parties." *Online Res. Corp. v. Lawlor*, 736 S.E.2d 886, 894 (Va. 2013). In other words, to interpret a facially ambiguous contract, parties must present extrinsic, factual evidence that the court can assess, evaluate and, if necessary, submit to a jury. *Id.* As a matter of federal law, that evidentiary process constitutes "a factual

determination that precludes dismissal on a motion for failure to state a claim." *Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992).

To determine whether a contract's language is ambiguous, Virginia courts "look at the words in issue within the four corners of the [contract] itself." *Eure v. Norfolk Shipbldg. & Drydock Corp., Inc.*, 561 S.E.2d 663, 668 (Va. 2002). A contract term stands ambiguous when it can reasonably carry "two or more meanings, [be] understood in more than one way, or [refer] to two or more things at the same time." *Aetna Cas. & Sur. Co. v. Fireguard Corp.*, 455 S.E.2d 229, 232 (Va. 1995). However, "[a] contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002).

Finally, the Supreme Court of Virginia has "consistently held that in the event of an ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement." *Drs. Co. v. Women's Healthcare Assocs., Inc.*, 740 S.E.2d 523, 526 (Va. 2013) (internal quotation omitted). This rule, known as the doctrine of *contra proferentem*, is a failsafe that "applies only as a tool of last resort to resolve persistent ambiguities." *Norfolk Southern*, 87 F.4th at 592 (citing, *inter alia*, *Donnelly v. Donatelli & Klein, Inc.*, 519 S.E.2d 133, 140 (Va. 1999)). This principle holds because, "[u]nlike contract rules that help to interpret the meaning of a term, and thereby uncover the intent of the parties, *contra proferentem* is by definition triggered only after a court determines that it *cannot* discern the intent of the parties." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 (2019).

The doctrine of *contra proferentem* described above explains Plaintiffs' incorrect contention that "it is not Plaintiffs' burden to prove what the Contract *precludes*" but rather that "it is [Apple's] burden to prove that there is contractual language that unambiguously *permits* the

challenged fees." (ECF No. 25 ("Pls' Mem.") at 5 (emphasis in original).)  Plaintiffs' argument misstates the applicable standard.  Virginia law does not envision a shifting burden of proof in claims for breach of contract, and Plaintiffs' claim to the contrary rests on language describing the rule of *contra proferentem*, not a burden-shifting procedure.  Plaintiffs' sole cited case states, in the context of an insurance dispute, that insurance companies "bear the burden of making their contracts clear."  *Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 514 (E.D. Va. 2011).  But that language does not describe burden-shifting in the procedural sense of the term.  *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) (directing courts to apply a burden-shifting framework in Title VII cases).  The *Overlook* Court used the term "burden" to describe Virginia's rule that "[w]here two constructions are equally possible, that most favorable to the insured will be adopted."  *Id.* at 514–15.  Plaintiffs, in short, mistake a substantive rule of contract interpretation for a burden-shifting rule.  Plaintiffs bear the burden of pleading (and eventually proving) their claim of breach.

### 2. Breach of Section 13

Before beginning to construe the Contract, it is prudent to restate Plaintiffs' theory of breach.  In Plaintiffs' own words, "[Apple]'s practice of charging [o]verdraft [f]ees even when sufficient available funds exist to cover a transaction" at the time of authorization "violates its contractual promise not to do so."  (SAC ¶ 53.)  Plaintiffs contend, in other words, that Apple's choice to assess customers' available balance for overdrafts at settlement rather than at authorization violates the Contract.  Plaintiffs thus must allege breach of Section 13, the Contract's overdrafts provision.  That section is reproduced below in relevant part:

**13. OVERDRAFTS**

**a. Payment of Overdrafts.**  If, on any day, the available balance in your share or deposit account is not sufficient to pay the full amount of a . . . [transaction] that is posted to your account, we may return the item or pay it, as described below.

> [Apple's] determination of an insufficient available account balance may be made at any time between presentation and [Apple's] midnight deadline with only one review of the account required. . . . Your account may be subject to a fee for each item regardless of whether we pay or return the item.
>
> . . . .
>
> If we pay [items that overdraw your account] or impose a fee that results in insufficient funds in your account, you agree to pay the insufficient amount, including the fee assessed by us, in accordance with our standard overdraft services or any other service you may have authorized with us or, if you do not have such protections with us, in accordance with any overdraft payment policy we have, as applicable.
>
> **b. Order of Payments.** Checks, drafts, transactions, and other items may not be processed in the order that you make them or in the order that we receive them. We may, at our discretion, pay a check, draft, or item, and execute other transactions on your account in any order we choose. The order in which we process checks, drafts, or items, and execute other transactions on your account may affect the total amount of overdraft fees that may be charged to your account.

Section 13(a) of the Contract plainly contemplates that customers will be "subject to a fee" for each overdraft. Plaintiffs have no quarrel with that term; instead, they contend that the Contract does not provide that an APSN transaction constitutes an overdraft in the first place. (Pls' Mem. at 7.) According to Section 13(a), an overdraft occurs "[i]f, on any day, the available balance in your share or deposit account is not sufficient to pay the full amount of a . . . [transaction] that is posted to your account." Apple reserves for itself the right to find an insufficient available balance "at any time between presentation and [Apple's] midnight deadline." (Contract § 13(a).) The Contract does not define the terms "available balance," "posted," and "presentation"; nor does it shed any light on the nature of Apple's "midnight deadline."[4] Each term, in the Court's estimation, appears to be a term of art lacking an "ordinary[] and popular" meaning. *PMA Capital*, 626 S.E.2d at 372. Looking only at the four

---

[4]   Apple's midnight deadline to do what? Neither Plaintiffs nor Apple can say, and the Court can do nothing but wonder.

10

corners of the Contract itself, the Court concludes that Section 13's language can be interpreted to mean that a transaction is "posted" and "presented" at authorization, not (as Apple insists) only at settlement.

In addition, although Section 13(b) states that Apple has the right to process transactions in any order that it chooses, the term "process" also stands undefined.  Section 13(b) thus may plausibly mean that Apple may authorize transactions in any order that it chooses, that it may settle transactions in any order that it chooses, or perhaps something else entirely.  In any event, although Section 13(b) reserves Apple the right to decide the order in which it processes transactions, the section says nothing to indicate whether Apple assesses overdrafts at authorization or settlement.  Indeed, Section 13(b)'s use of the term "process," as contrasted with Section 13(a)'s "post" and "present," further increases the opacity of the Contract's plain meaning.  In short, because the face of the Contract presents insufficient information to answer those questions, the Court finds Section 13 to be "ambiguous on its face."  *Eure*, 561 S.E.2d at 668.

Because the Court finds the Contract ambiguous at this threshold stage, it must necessarily use extrinsic, parol evidence to determine the intent of the parties.  *Lawlor*, 736 S.E.2d at 894.  That conclusion alone should end the analysis.  However, eager to decide the meaning of the Contract in a preliminary posture, the parties debate extrinsic evidence that cannot be considered on a motion to dismiss.

As relevant here, the parties spill rivers of ink debating the meaning of a document labeled "Overdraft Protection Options" that Plaintiffs attached to the operative complaint as

11

Exhibit C.[5]  (ECF No. 17-3 ("OPO").)  Apple treats this document as part of the Contract; but on a motion to dismiss, where all reasonable inferences must be drawn in favor of the Plaintiffs, the Court cannot make that logical leap.  To begin with, the Contract appears on the docket as a document within a document.  The Contract is titled "Membership and Account Agreement," and that "Membership and Account Agreement" composes part of what Exhibit A to the SAC terms a "Membership Agreement and Disclosures."  (ECF No. 17-1 at 1, 4.)  The "four corners" of the Contract may be drawn around either the individual Agreement or the whole "Agreement and Disclosures," but neither set of documents contains the OPO.  In other words, at their broadest, the "four corners" of the Contract end on the last page of Exhibit A and do not reach Exhibit C, which contains the OPO.[6]  Indeed, the SAC refers to the three documents separately and dubs only Exhibit A as "the Contract."  (SAC ¶ 2.)  Where, as here, the four corners of a contract fail to unambiguously support either side, Virginia law compels a finding of ambiguity.  And because contractual ambiguity "precludes dismissal on a motion for failure to state a claim," the Court's finding of facial ambiguity ends the Rule 12(b)(6) inquiry as a matter of federal law.  *Martin Marietta*, 991 F.2d at 97.[7]

---

[5]    Plaintiffs do not argue that the OPO should not be considered.  Thus, the Court assumes that Plaintiffs have adopted the OPO by reference pursuant to Rule 10(c).

[6]    For this reason, too, it would be inappropriate to consider Plaintiffs' allegation that Apple "has no discretion and must pay" for a transaction at the time of authorization.  (SAC ¶ 36 (citing *Electronic Fund Transfers*, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009)).)

[7]    *See also Revitalizing Auto Cmtys. Env'tl Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 442 (2d Cir. 2024) (contractual ambiguity "preclud[es] dismissal on the pleadings"); *McAuliffe v. Vail Corp.*, 69 F.4th 1130, 1143 (10th Cir. 2023) ("When a claim rests on interpretation of a contract," ambiguity forecloses dismissal); *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 711 (1st Cir. 2022) ("ambiguous contract language may not be resolved in a motion to dismiss."); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1118 (9th Cir. 2018) (an ambiguous contract "presents a question of fact inappropriate for resolution on a motion to dismiss.").

### 3.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Apple argues for dismissal of Plaintiffs' implied covenant claim only in a footnote.  (ECF No. 19 ("Def's Mem.") at 14–15 n.5.)  That footnote asserts that Virginia common law forecloses application of the implied covenant of good faith and fair dealing to rights expressly created by contract.  *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997).  Apple argues, in effect, that Plaintiffs' implied-covenant argument must rise or fall with the merits of their contract argument.  However, the ambiguity of the Contract precludes the Court from determining at this stage whether the Contract gives Apple the unlimited discretion that it asserts.  Accordingly, Apple's motion to dismiss Count One will be denied in full.

### B.    Regulation E (Count Two)

Abigail McAllister brings her second count pursuant to Regulation E — specifically, the Opt-In Rule, 12 C.F.R. § 1005.17.  Apple argues that McAllister has no private right of action to enforce the Opt-In Rule, and that even if she does, she fails to plead a violation of the Opt-In Rule on which relief may be granted.  The Court disagrees.

### 1.    Cause of Action

McAllister has a private right of action to enforce the Opt-In Rule in federal court. Although the analysis required to reach that conclusion proceeds in several steps, the syllogism driving that analysis is straightforward.  The EFTA contains a private cause of action for violation of its provisions, and the EFTA elsewhere mandates that Apple comply with the Opt-In Rule.  McAllister's cause of action therefore arises from the EFTA, not from Regulation E. Apple insists that the EFTA's express cause of action does not count; instead, it protests, absent express authorization for suit in Regulation E itself, McAllister's claim must fail.  But Apple misunderstands the governing law.  Despite Apple's arguments to the contrary, nothing that

Regulation E says or fails to say can narrow the scope of the cause of action that Congress created.

It should be noted that the Court does not approach the cause-of-action question in an analytical vacuum. Plaintiffs have successfully enforced Regulation E in federal court for years. Apple can point to no court that has suspected, even in *dicta*, that Regulation E plaintiffs might lack a cause of action. The only case squarely addressing Apple's argument rejects it. *See Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 492–95 (E.D.N.Y. 2020) (analyzing whether the EFTA provides a cause of action to enforce Regulation E). Apple argues correctly that *Lussoro* does not bind the Court. (ECF No. 26 ("Def's Reply") at 13–14). Indeed, because the existence of a cause of action is a waivable issue,[8] the myriad cases permitting plaintiffs to sue without comment have little force on their own. When aggregated, however, these cases have some power to persuade.[9] Absent controlling caselaw, the Court has no choice

---

[8]   "[T]he absence of a valid . . . cause of action does not implicate subject-matter jurisdiction," *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 642–43 (2002), and, unless an issue is jurisdictional, it can be waived. *See Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 779 (4th Cir. 2023) (holding that choice of law "is waivable, not jurisdictional").

[9]   *See, e.g.*, *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1243 (11th Cir. 2019) (stating in passing that "Regulation E is part of the CFPB's implementation" of the EFTA and therefore enforceable by private parties); *Wellington v. Empower Fed. Credit Union*, 533 F. Supp. 3d 64, 69–70 (N.D.N.Y. 2021) (adopting *Lussoro* without analysis); *Adams v. Liberty Bank*, 2021 WL 3726007, at *2 (D. Conn. Aug. 23, 2021) (same); *Chambers*, 222 F. Supp. 3d at 6 (assuming the issue); *Pinkston–Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 856 (W.D. Mich. 2016) (same); *Walbridge v. Ne. Credit Union*, 299 F. Supp. 3d 338, 348 (D.N.H. 2018) (same); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 376 (D. Conn. 2018) (same); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 146 (D.S.C. 2018) (same); *Hinton v. Atl. Union Bank*, 2020 WL 9348205, at *3 (E.D. Va. Nov. 2, 2020) (same); *Fludd v. S. State Bank*, 566 F. Supp. 3d 471, 479–83 (D.S.C. 2021) (same).

but to proceed from first principles.  Nevertheless, district courts' uniform and widespread accession to Regulation E actions forms important context for the reasoning that follows.

The EFTA's private right of action lies in Section 916, codified at 15 U.S.C. § 1693m, which allows "any consumer" to sue "any person who fails to comply with any provision of [the EFTA]."  Section 905 of the EFTA, codified at 15 U.S.C. § 1693c, directs that "[t]he terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed at the time the consumer contracts for an electronic fund transfer service, in accordance with regulations of the [CFPB]."  Those initial disclosures must include "any charges for electronic fund transfers or for the right to make such transfers."  EFTA § 905(a)(4).  If Apple fails to disclose "terms and conditions of electronic fund transfers" as the CFPB dictates, *id.*, Apple thereby violates Section 905 and therefore has "fail[ed] to comply with [a] provision of [the EFTA]" within the meaning of Section 916.

The statutory structure of the EFTA means that the existence of McAllister's cause of action to enforce the Opt-In Rule against Apple depends on whether the Opt-In Rule constitutes a regulation of the CFPB — specifically, one that regulates disclosure of the terms and conditions of electronic fund transfers within the meaning of Section 905.  The Court answers that question below.  It concludes that overdraft fees, though not electronic fund transfers themselves, constitute terms and conditions of electronic fund transfers; that the Opt-In Rule therefore stands incorporated into Section 905 and actionable under Section 916; and that none of Apple's contrary arguments carry persuasive force.

### a.     *"Electronic Fund Transfers"*

The overdrafts that the Opt-In Rule regulates are not in themselves "electronic fund transfers" within the meaning of the EFTA.  This is so because Section 903(7) of the EFTA

defines "electronic fund transfers" to mean "any transfer of funds . . . which is initiated through an [electronic device] so as to *order, instruct, or authorize* a financial institution to debit or credit an account."  EFTA § 903(7) (codified at 15 U.S.C. § 1693a(7)) (emphasis added).  By its plain meaning, that definition does not reach transfers (like the automatic overdraft fees at issue here) that a financial institution initiates of its own accord.

CFPB regulations confirm Section 903(7)'s ordinary language.  Congress delegated authority to the CFPB to define the scope of exceptions from the definition of "electronic fund transfer."  *Id.* ("Such term does not include" five exceptions, "as determined under regulations of the [CFPB].").[10]  And the relevant regulation of the CFPB clarifies the term "electronic fund transfer" by excluding automatic bank transfers from its scope:

> *Exclusions from coverage.*  The term "electronic fund transfer" does not include:
>
> . . . .
>
> (5)    *Automatic transfers by account-holding institution.*  Any transfer of funds under an agreement between a consumer and a financial institution which provides that the institution will initiate individual transfers without a specific request from the consumer:
>
> > . . .
> >
> > (iii)    Between a consumer's account and an account of the financial institution, except that these transfers remain subject to . . . sections 916 and 917 of the [EFTA] regarding civil and criminal liability.

---

[10]    Congress's express delegation to the CFPB permits the Court to rely on the CFPB's regulations without addressing whether Section 903(7) is ambiguous.  *See Mohamed v. Bank of Am. N.A.*, 93 F.4th 205, 207–08 (4th Cir. 2024) (doing the same with respect to Section 903(2)'s definition of "account").  Nevertheless, because Section 903(7) unambiguously defines the term "electronic fund transfers," the CFPB's regulations and interpretations are no more than "extra icing on a cake already frosted."  *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (quotation omitted).

12 C.F.R. § 1005.3(c).  That describes Apple's overdraft program to a tee.  The Court finds it

clear that Apple's overdrafts are not "electronic fund transfers" within the meaning of

Section 905 and proceeds to consider whether overdrafts may nonetheless be subject to Section

905 as "terms and conditions."

### b.      *"Terms and Conditions"*

Although Apple's overdraft fees are not in themselves electronic fund transfers, the

statute and regulations — not to mention the weight of the caselaw — make clear that Apple's

policies governing overdraft fees constitute *terms and conditions* of electronic fund transfers.

*See, e.g.*, *Tims*, 935 F.3d at 1243 (stating, though not squarely holding, that the Opt-In Rule is

actionable because it implements Section 905).

When a customer makes a purchase using a debit card, that point-of-sale transaction

"order[s]" Apple to credit — that is, to transfer money from — that customer's account within

the meaning of Section 903(7).  Once again, the CFPB's regulations drive that point home and

clarify that "electronic fund transfer" includes "[p]oint-of-sale transfers" and "[t]ransfers

resulting from debit card transactions, whether or not initiated through an electronic terminal."

12 C.F.R. § 1005.3(b)(1)(i), (v).  The SAC's description of a debit card transaction comports with

the Court's and the CFPB's understanding and confirms that such transactions constitute

"electronic fund transfers."  (SAC ¶¶ 33–34.)  If Apple's overdraft policy is a term or condition

of its customers' debit card transactions, then the Opt-In Rule — which regulates the disclosure

of Apple's overdraft policy — must bind Apple under Section 905 of the EFTA and therefore

give rise to a cause of action under Section 916.

Ordinary meaning easily fills in the last step of the chain of reasoning already described.

The "usual sense in law" of the phrase "terms and conditions" signifies "conditions or

stipulations limiting what is proposed to be granted or done." *Terms and Conditions*, Garner's Dictionary of Legal Usage (3d ed. 2011).  The ordinary sense of the two words, considered separately, appears to be identical.  One dictionary defines "condition" as "[o]ne that is indispensable to the appearance or occurrence of another; a prerequisite," *Condition (n.)*, sense 3.a, American Heritage Dictionary (5th ed. 2022), and describes "term" as "[o]ne of the elements of a proposed or concluded agreement; a condition," *id.* at *Term (n.)*, sense (4)(a).[11] Apple makes clear to its customers via its Opt-In Form that Apple will not pay a customer's overdrafts on debit card transactions unless that customer consents to its "standard overdraft practices."  Apple's overdraft fees must therefore be a term or condition of an electronic fund transfer service, namely, an element, prerequisite or limitation of Apple's offer to make certain kinds of electronic fund transfers by paying the underlying overdrafts themselves.[12]

### c.    *"Terms and Conditions of Electronic Fund Transfers"*

The CFPB's Opt-In Rule requires Apple to provide its consumers "with a notice in writing . . . describing [its] overdraft service."  12 C.F.R. § 1005.17(b)(i).  Putting this final piece of the puzzle together with all of the others, the Court readily concludes that the Opt-In Rule constitutes a "regulation[] of the [CFPB]" concerning the disclosure of "[t]he terms and

---

[11]    *See also, e.g.*, *Condition (n.)*, sense 5, Webster's II New Riverside University Dictionary (1986) ("Something indispensable to the appearance or occurrence of something else").  No less an authority than the Oxford English Dictionary defines the word "term," as used in the phrase "terms and conditions," as "a stipulated requirement or limitation."  *Term (n.)*, sense II.6.a, Oxford English Dictionary (Dec. 2023).  The OED traces this sense of the phrase back nearly 200 years.  *Id.* (quoting Times (London), July 5, 1833, at 4 ("The only difficulty was adjusting the terms and conditions of the charter.")).

[12]    This conclusion comports with the reasoning of the only other federal tribunal to have opined on Apple's cause-of-action argument after adversarial briefing.  *See Lussoro*, 456 F. Supp. 3d at 494 (concluding that "overdraft fees are part of the terms and conditions that banks may place on electronic fund transfers" and that thus "the EFTA's private right of action extends to . . . [the Opt-In Rule]").

conditions of electronic fund transfers involving a consumer's account." EFTA § 905(a)(1).[13]
Ordinary principles of interpretation support this conclusion, and Apple's attempts to resist them
ring hollow.

Despite Apple's attempt to claim otherwise, the Opt-In Rule's terms do not contradict
Section 905's requirement that terms and conditions of electronic fund transfer services "shall be
disclosed at the time the consumer contracts" for the service. (Def's Suppl. Br. at 5 (quoting 15
U.S.C. § 1693c(a)(1)).) Apple's argument goes like this: Section 905 delegates regulatory
power to the CFPB to decide what kind of disclosures need to be made "at the time the consumer
contracts" for an electronic fund transfer service. That section requires disclosure of "any
charges for electronic fund transfers or for the right to make such transfers," EFTA § 905(a)(4),
and the CFPB, parroting the statutory text, has implemented that requirement by mandating
initial disclosure of "[a]ny fees imposed by the financial institution for electronic fund transfers
or for the right to make such transfers," 12 C.F.R. § 1005.7(b)(5). The CFPB's official
interpretation of that regulation states that "[a]n institution is required to disclose all fees for
[electronic fund transfers] or for the right to make them." *7(b)(5) Fees* ¶ 1, 12 C.F.R. pt. 1005,
supp. I, at 219. "Other[] fees (for example, minimum-balance fees, stop-payment fees, or
account overdrafts) may, but need not, be disclosed." *Id.* So Apple argues that these authorities
show that the CFPB does not consider overdraft fees to be the sort of fee that Section 905
requires to be disclosed upon the opening of an account.

---

[13] For this reason, CFPB regulations exclude intra-institutional transfers like overdraft fees
from the definition of "electronic fund transfer" but provide that they remain subject to liability
under Section 916. 12 C.F.R. § 1005.3(c)(5)(iii). Apple cannot prevail on that section alone
because that language merely reminds the reader that Section 916 creates liability for more than
electronic fund transfers. (*See* ECF No. 32 ("Def's Suppl. Br.") at 3 (relying on Section
1005.3(c)(5)(iii)'s exclusion).)

As McAllister persuasively argues, Apple's reading of the CFPB's interpretive guidance "finds no support in the text of the EFTA or Regulation E."  (ECF No. 33 ("Pls' Suppl. Reply") at 6.)  For that reason, assuming without deciding that the CFPB's guidance means what Apple says, the Court can give that guidance no deference and must reject Apple's argument.

Although Apple correctly states in support of its position that a court must give "substantial deference to an agency's interpretation of its own regulation," that deference cannot be granted unless "a regulation is ambiguous."  *Romero v. Barr*, 937 F.3d 282, 290 (4th Cir. 2019).  Indeed, as the Supreme Court recently emphasized, "a regulation can only be deemed 'genuinely ambiguous' '[i]f uncertainty . . . exist[s]' 'even after a court has resorted to all the standard tools of interpretation,' including consideration of 'text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on.'"  *Id.* at 291 (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–15 (2019)) (alterations in original).  If the agency's view does not constitute a reasonable interpretation of a truly ambiguous regulation, the court owes the agency's view no deference.  *Id.*

Apple's gloss on the CFPB's interpretation would wall off overdrafts from the reach of Section 1005.7 in contravention of the regulation's plain text.  As outlined above, *see* Section III.B.1.b, Apple's overdraft protection program, which is an agreement to make electronic fund transfers and thus an "electronic fund transfer service," includes the payment of overdraft fees as a term or condition.  It stands to reason that if a customer of Apple's fails to sign its Opt-In Form, and if that customer then attempts to overdraw their account, Apple will refuse to pay for that transaction.  Because a customer directs Apple to make an electronic fund transfer when that customer tries to overdraw their account, and because Apple will not make that electronic fund transfer without the customer first consenting to pay an overdraft fee, Apple's overdraft fees

unambiguously constitute "fees . . . for electronic fund transfers or for the right to make such transfers." 12 C.F.R. § 1005.7(b)(5).  The language of Section 1005.7 confirms rather than rebuts McAllister's position and supports rather than weakens her reliance on Section 905. Because the interpretation that Apple cites flouts those authorities, the Court may not give that interpretation deference.

In conclusion, because overdraft fees constitute a charge for some electronic fund transfers, overdraft fees are a "condition[] of electronic fund transfers" within the meaning of Section 905.  Because the Opt-In Rule regulates the disclosure of those fees, it constitutes one of the regulations of the CFPB that stands incorporated into Section 905.  Thus, if Apple violates the Opt-In Rule, Apple "fails to comply with" Section 905, and McAllister has a cause of action under Section 916(a).  McAllister possesses an express statutory cause of action, and that should end the matter.[14]

### d.    Apple's Other Arguments Against a Cause of Action

Apple raises several more arguments to counter the unambiguous meaning of the EFTA's and Regulation E's text.  Each fails.

First, Apple argues, in reliance on the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), that "a federal agency cannot create a private action for violation of a regulation where the statute that the agency is interpreting does not explicitly grant one."

---

[14]    McAllister also argues that she has a cause of action under Section 910 of the EFTA, codified at 15 U.S.C. § 1693h.  (Pls' Mem. at 15.)  Her Section 910 argument, unlike her Section 916 argument, fails to persuade.  Section 910 certainly premises civil liability on "regulations of the [CFPB]."  EFTA § 910(a)(1)(E).  But Section 910's cause of action creates civil liability on Apple's part for "failure to make an electronic fund transfer . . . *except* where . . . otherwise provided in regulations of the [CFPB]."  *Id.* at (a)(1) (emphasis added).  Section 910 does not create an independent obligation to comply with CFPB regulations; rather, Section 910 designates CFPB regulations as a safe harbor from liability.  Only Section 916, in combination with Section 905 and the Opt-In Rule, creates liability here.

(Def's Mem. at 15.)  Apple correctly states *Sandoval*'s holding, but Apple errs by incorrectly applying it.  *Sandoval* has no relevance here, because that case concerned implied rights of action, not express ones.  There, the Supreme Court found that a Department of Education regulation implementing Title VI did not create "a private cause of action to enforce the regulation" where the regulation proscribed conduct that was not within the scope of Title VI's judicially implied cause of action.  532 U.S. at 279–80.  Here, Apple's alleged conduct falls within the EFTA's express private cause of action by simple statutory interpretation.  No implied right of action has been invoked, so Apple's citation of *Sandoval* misses the mark.

Next, Apple objects that Regulation E (and the Opt-In Rule with it) was not intended by the CFPB to be enforced by private parties.  Apple stresses that Regulation E itself provides only that "[c]ompliance with [Regulation E] is enforced in accordance with section 918 of the [EFTA]," codified at 15 U.S.C. § 1693*o*, which concerns the administrative enforcement of the EFTA.  12 C.F.R. § 1005.13(a).  And Apple, noting that the CFPB did not rely on Section 916 when it promulgated Regulation E, insists that "the CFPB did not intend to create a private right of action for violations of Regulation E" because "it would have explicitly done so" had it so wished.  (Def's Mem. at 17–18.)[15]

---

[15]     Apple also argues that Congress foreclosed private suit under Regulation E because Section 916 creates liability only for "any provision of the [EFTA]" while Section 917, concerning criminal liability, proscribes violation of the EFTA "or any regulation issued thereunder."  (*See* ECF No. 34 ("Def's Suppl. Reply") at 4 (discussing 15 U.S.C. §§ 1693m(a) and 1693n(a)(1)).)  Apple has the better of the argument insofar as Section 916 creates no cause of action for violation of any portion of Regulation E not incorporated into the EFTA by reference — for instance, regulations grounded only in the CFPB's general power to advance the EFTA's purposes under Section 904.  However, as the foregoing analysis shows, the Opt-In Rule falls outside that category.  *See Lussoro*, 456 F. Supp. 3d at 494 (finding that the Opt-In Rule "only applies, rather than expands, [the] EFTA's provisions.").

Apple's argument fails, because it ignores the true lesson of *Sandoval*:  "[P]rivate rights of action to enforce federal law must be created by Congress."  532 U.S. at 286.  The proper inquiry centers on congressional intent, which "is determinative" on this question.  *Id.  Sandoval* held that a regulation "may invoke a private right of action that Congress created" but "may not create a right that Congress has not."  *Id.* at 291.  The case did not hold that an agency could negate a Congressionally created right.

Apple's flawed argument rests on a passing suggestion by the *Sandoval* Court that merits reprinting in full:

> Thus, when a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable.  But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress.  Agencies may play the sorcerer's apprentice but not the sorcerer himself.

532 U.S. at 291.  This hypothetical does not apply on its own terms, as the EFTA contains no "general authorization for private enforcement of regulations."  *Id.*  Moreover, as the *Sandoval* Court itself stated, "[a] Court is bound by holdings, not language."  *Id.* at 282.  Apple's cited phrase, in other words, amounts to no more than *obiter dictum* without binding effect.[16]  *See Payne v. Taslimi*, 998 F.3d 648, 655 (4th Cir. 2021) (only reasoning "necessary to the outcome . . . must be followed").  Of course, "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative."  *Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2003) (quoting *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir.

---

[16]    According to one elegant definition, "[a] dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding — that, being peripheral, may not have received the full and careful consideration of the court that uttered it."  *Sarnoff v. Am. Home Prod. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986) (Posner, J.).

2003) and collecting cases).  But not all dicta carry equal force, and Apple cannot characterize *Sandoval*'s throwaway hypothetical as "carefully considered."  *Id.*; *see Schwab v. Crosby*, 451 F.3d 1308, 1326 (11th Cir. 2006) (contrasting "devoid-of-analysis, throw-away" dicta with "well thought out, thoroughly reasoned, and carefully articulated" dicta); Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1037 (2005) (arguing that hypothetical statements should not be accorded binding status).  Apple relies on it at its own risk.

In any event, even if a statute could delegate power to an agency to define the scope of its private cause of action, Congress did not make the delegation that Apple desires.  Congress wrote the EFTA's private right of action broadly, and it gave the CFPB limited and specific power to constrain the scope of liability under the statute.  Congress's careful draftsmanship militates against implying Apple's desired delegation.

Here, the Court's delegation analysis begins and ends, as the *Sandoval* Court's did, with the relevant statute's "text and structure."  *Sandoval*, 532 U.S. at 288.  Section 916 covers "*any* person who fails to comply with *any* provision of [the EFTA] with respect to *any* consumer." EFTA § 916(a) (emphasis added).  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)).  In the EFTA, just as in the statute at issue in *Gonzales*, "Congress did not add any language limiting the breadth of that word," *id.*; instead, Section 916's repeated use of the word "any" counsels reading the EFTA's private right of action to have the broadest possible scope.

In fact, Congress gave the CFPB some power to narrow Section 916 — just not the power that Apple suggests.  Section 916 contains a safe harbor that prohibits liability for "any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by

the [CFPB]" and "any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the [CFPB]."  EFTA § 916(d).  This language grants Apple a powerful affirmative defense, but it also hoists Apple's argument by its own petard. Apple invokes *expressio unius est exclusio alterius*[17] to argue that "the CFPB has consciously declined to include" a private cause of action for violations of Regulation E.  (Def's Mem. at 18.) Here, though, that canon cuts the other way.

Section 916(d) shows that Congress chose a specific means by which the CFPB could shape and narrow the EFTA's private right of action.  That Congress chose affirmatively to do so suggests that Congress chose affirmatively *not* to give the CFPB power to chip away at Section 916 by implication.  Indeed, because the Opt-In Rule enforces Section 905, the Opt-In Rule "authoritatively construe[s] the statute itself," leaving it "meaningless to talk about a separate cause of action to enforce the regulations apart from the statute."  *Sandoval*, 532 U.S. at 284; *see also Peters v. Jenney*, 327 F.3d 307, 316 (4th Cir. 2003) (a statutory cause of action extends to a regulation if the regulation is "an interpretation of [the statute's] core . . . mandate"); *Lussoro*, 456 F. Supp. 3d at 494 (reaching the same conclusion).  Section 916's breadth and express — but limited — delegation to the CFPB foreclose Apple's desired reading of the statute.

Finally, Apple argues pure policy by insisting that finding a cause of action would "run[] contrary to the broader idea that administrative agencies are granted a degree of autonomy to promulgate regulations precisely because they are in a better position to do so than other bodies." (Def's Reply at 13 (citing *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 865 (1984)).)  But the Court must apply law, not policy, and Congress already made the relevant policy judgment by

---

[17]     This Latin interpretative maxim, otherwise known as the "negative-implication canon," means only that "specification of the one implies exclusion of the other."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012).

creating and defining the scope of civil liability in the EFTA. The CFPB has no power to negate Congress's policy choices, and Apple cannot manufacture such a power for its convenience.

In the final analysis, Sections 905 and 916 of the EFTA, taken together, give McAllister a private cause of action for the violation of any CFPB rule that regulates the disclosure of the terms and conditions of electronic fund transfers. The EFTA's private right of action covers the Opt-In Rule, and McAllister thus has authorization to sue.[18]

## 2. The Merits of McAllister's Regulation E Claim

Because McAllister possesses a private right of action to enforce the Opt-In Rule against Apple, the Court must next determine whether McAllister successfully states a claim for violation of that regulation. The Opt-In Rule states that Apple may not enroll its customers in Apple's overdraft service unless it provides customers "a notice in writing . . . segregated from all other information, describing the institution's overdraft service." 12 C.F.R. § 1005.17(b)(1)(i). The notice must be "substantially similar" to a model form promulgated by the CFPB and disclose "the types of transactions for which a fee or charge for paying an overdraft may be imposed." *Id.* at (d); *Adams*, 2021 WL 3726007, at *2. For ease of reference, the CFPB's benchmark form, Model Form A-9, is reproduced below.

---

[18]    Although the SAC does not expressly invoke Section 905 or Section 916, that omission is beside the point because "[t]he Federal Rules of Civil Procedure 'do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.'" *Stanton v. Elliott*, 25 F.4th 227, 237–38 (4th Cir. 2022) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (*per curiam*)). Courts, appropriately, "are more forgiving" of such "legal misstatements" than they are of failures to plead facts with plausibility. *Id.*

A-9 Model Consent Form for Overdraft Services § 1005.17

# What You Need to Know about Overdrafts and Overdraft Fees

An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have <u>standard overdraft practices</u> that come with your account.
2. We also offer <u>overdraft protection plans</u>, such as a link to a savings account, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our <u>standard overdraft practices</u>.

### What are the <u>standard overdraft practices</u> that come with my account?

We do authorize and pay overdrafts for the following types of transactions:
- Checks and other transactions made using your checking account number
- Automatic bill payments

We <u>do not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
- ATM Transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction.

If we do not authorize and pay an overdraft, your transaction will be declined.

### What fees will I be charged if [institution name] pays my overdraft?

Under our standard overdraft practices:
- We will charge you a fee of up to **$30** each time we pay an overdraft.
- Also, if your account is overdrawn for 5 or more consecutive business days, we will charge an additional $5 per day.
- There is <u>no limit</u> on the total fees we can charge you for overdrawing your account.

### What if I want [institution name] to authorize and pay overdrafts on my ATM and everyday debit card transactions?

If you also want us to authorize and pay overdrafts on ATM and everyday debit card transactions, call [telephone number], visit [website], or complete the form below and [present it at a branch][mail it to:

_____

_____ I <u>do not</u> want [institution name] to authorize and pay overdrafts on my ATM and everyday debit card transactions.
_____ I want [institution name] to authorize and pay overdrafts on my ATM and everyday debit card transactions.

Printed Name: _____
Date: _____
[Account Number:] _____

12 C.F.R. pt. 1005, app. A, at 189.  Regulation E elsewhere supplements the Opt-In Rule by providing that all disclosures "shall be clear and readily understandable."  12 C.F.R. § 1005.4(a)(1); *see also* EFTA § 905(a) (commanding that "disclosures shall be in readily understandable language").  In short, unless customers provide affirmative consent after receiving clear and understandable disclosure — in other words, opt in — a financial institution may not assess those customers overdraft fees.

McAllister alleges that Apple's Opt-In Form falls short of these requirements "because it misrepresents Apple's overdraft practices."  (SAC ¶ 120.)  Specifically, she argues that the Opt-In Form's "overly simplistic language" says nothing about Apple's method for determining if a customer "do[es] not have enough money as an available balance . . . to cover a transaction." (Pls' Mem. at 17; Opt-In Form.)  This language, McAllister avers, insufficiently warns customers that APSN transactions incur overdraft fees.

Apple argues that its Opt-In Form, together with the OPO, "provides an accurate and plain-English description of how Apple calculates overdrafts."  (Def's Mem. at 20.)  It also argues — in a footnote — that the exhibit-prevails rule requires that the OPO and the Opt-In Form be considered together, because Plaintiffs attached both forms to the SAC.  (*Id.* at 20 n.6.)

Construing all facts in McAllister's favor, the Court concludes that the exhibit-prevails rule does not apply, because the OPO does not contradict McAllister's theory.  The Opt-In Rule requires that notice must be "segregated from all other information" and formatted to be "substantially similar" to Model Form A-9.  12 C.F.R. § 1005.17(b)(1)(i), (d).  The Opt-In Form shares many features with Model Form A-9.  (SAC Ex. B.)  The OPO document, on the other hand, betrays no such resemblance.  (SAC Ex. C.)  Drawing all inferences in McAllister's favor, the Court finds it plausible that the Opt-In Form by itself constitutes the segregated notice

required by the Opt-In Rule.  Indeed, if the OPO were part of the segregated notice in question, Apple would risk running afoul of the Opt-In Rule's substantial similarity requirement.  Thus, as many courts have found in analogous cases, the SAC supports a plausible inference that the OPO "is extraneous information, irrelevant to whether the [Opt-In Form] itself — *i.e.*, the segregated document — adequately explains [Apple's] overdraft policy." *Grenier v. Granite State Credit Union*, 570 F. Supp. 3d 18, 22 (D.N.H. 2021).  In other words, "under Regulation E, the [Opt-In Form] must pass muster on its own," and the Court assumes that only its contents are at issue here.  *Adams*, 2021 WL 3726007, at *4; *see also Miller v. Del-One Fed. Credit Union*, No. 1:21-cv-1433, 2022 WL 2817875, at *1 (D. Del. July 19, 2022) (Bibas, J., sitting by designation) (under the Opt-In Rule, "all relevant information" must be contained in "one 'separate[]' document").  McAllister, in short, need not argue that the OPO document's statements are not true.  If that were otherwise, the exhibit-prevails rule would apply.  Here, though, McAllister correctly argues that the OPO lacks legal relevance on a motion to dismiss.  Because the OPO does not "negate[] the claim" that Plaintiffs plead, *Goines*, 822 F.3d at 166, the exhibit-prevails rule does not destroy McAllister's claim.

At bottom, McAllister states a claim for violation of Regulation E, because the Opt-In Form does not on its face address any of the policies to which McAllister objects.  Nothing in the Opt-In Form states that Apple assesses overdrafts at settlement rather than at authorization, and nothing in it suggests that APSN transactions incur overdraft fees.  And when an opt-in form proves "ambiguous," a court may find it "plausible that the notice does not describe the overdraft service in a 'clear and readily understandable' way." *Tims*, 935 F.3d at 1243–44; *see also Wellington*, 533 F. Supp. 3d at 70 ("ambiguous language" on an opt-in form plausibly violates Regulation E); *Fludd*, 566 F. Supp. 3d at 483 (an agreement that "inaccurately or incompletely

describes" when overdrafts are assessed can be neither clear nor understandable).  The ambiguities and omissions to which McAllister points thus prove sufficient to plausibly state a claim on which relief can be granted.

## IV.      CONCLUSION

The Contract on which Movers and McAllister sue presents ambiguities unsuitable for resolution on a motion to dismiss.  Further, Section 916 of the EFTA gives McAllister a private right of action to enforce the Opt-In Rule, whose dictates the EFTA incorporates through Section 905.  15 U.S.C. §§ 1693m, 1693c.  Finally, McAllister plausibly pleads that Apple's overdraft policy violates the Opt-In Rule.  Accordingly, the Court will DENY Apple's Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint (ECF No. 18).

An appropriate order shall issue.

Let the Clerk file a copy of this Memorandum Opinion and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Alexandria, Virginia
Date: <u>March 13, 2024</u>